# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                           :

In re:                                     :          Chapter 11
                                             :

RUBIE'S COSTUME COMPANY, INC., *et al.*   :          Case No.
                                             :

                                             :          (Pending Joint Administration)
                                             :

                             Debtors.       :

---------------------------------------------------------------x

## INTERIM ORDER (I) AUTHORIZING THE
## DEBTORS' USE OF CASH COLLATERAL, (II) GRANTING
## ADEQUATE PROTECTION, (III) SCHEDULING A FINAL
## HEARING AND (IV) GRANTING RELATED RELIEF

Upon consideration of the emergency motion (the "Motion")[1] of Rubie's Costume

Company, Inc. ("Rubies"), Forum Novelties Inc. ("Forum"), Buyseasons Enterprises, LLC

("Buyseasons"), Masquerade, LLC ("Masquerade"), The Diamond Collection LLC ("Diamond

Collection"), and Rubie's Masquerade Company LLC ("Rubie's Masquerade"), Debtors and

Debtors-in-Possession (collectively, the "Debtors") for entry of (i) an interim order (the "Interim

Order"):  (a) authorizing the Debtors pursuant to Sections 105(a), 361, and 363 of the

Bankruptcy Code, and Bankruptcy Rule 4001(b), to use cash collateral; (b) providing adequate

protection to the Bank Group and HSBC with respect to any diminution in the value of its

interests in the Prepetition Collateral (as defined below) pledged by the Debtors to secure the

Prepetition Obligations (as defined below); and (c) scheduling a final hearing on the Motion (the

"Final Hearing"); and (ii) for entry of a final order (the "Final Order") (a) authorizing the

Debtors to use Cash Collateral, including the Pledged Accounts Cash, (each as defined below);

and (b) granting the Bank Group and HSBC adequate protection with respect to any diminution

---

[1]     Capitalized terms used but not defined in this Order shall have the meaning ascribed to them in the Motion.

in the value of its interests in the Prepetition Collateral (as defined below) pledged by the Debtors to secure the Prepetition Obligations, all as more fully set forth in the Motion; and upon consideration of the Motion and First-Day Declaration and Declaration of Baker Smith in support of the Motion; and due and proper notice of the Motion having been given; and the Court having reviewed the Motion, the materials submitted in support of the Motion, the arguments of counsel and upon the record, and following completion, of the Interim Hearing (as defined below),

**THE COURT HEREBY FINDS**:

A.      <u>Petition Date</u>.  On April 30, 2020 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") commencing chapter 11 cases (the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the Eastern District of New York (this "<u>Court</u>").  The Debtors continue in management and operation of their business and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No Official Committee of Unsecured Creditors (the "<u>Committee</u>") has been appointed by the Office of the United States Trustee for the Eastern District of New York (the "<u>U.S. Trustee</u>") in the Chapter 11 Cases.

B.      <u>Jurisdiction;  Core Proceeding</u>.  This Court has jurisdiction over this matter and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      <u>Stipulations of the Debtors.</u>  Subject to paragraph 9 below, the Debtors acknowledge, admit, stipulate and agree (collectively, the "<u>Stipulations</u>") that:

1.      The Debtors are a borrower under a 3-Year Credit Agreement, dated as of

July 22, 2016 and amended by (i) that certain Amendment No. 1 and Waiver, dated as of July 9,

2017, (ii) that certain Amendment No. 2 and Waiver, dated as of October 18, 2018 (the "Credit

Agreement") from a bank group consisting of Bank of America, NA;  Wells Fargo Bank, NA;

JP Morgan Chase Bank, NA ("JPM");  TD Bank, NA,; Citibank, NA, ("Citi") and HSBC Bank,

USA, NA ("HSBC," and collectively, the "Bank Group"), for which HSBC serves as

Administrative Agent, and together with all other loan and security documents executed in

connection with the Credit Agreement, the "Credit Agreement Documents").

2.      As of the Petition Date, approximately $35,000,000 in aggregate principal

amount was outstanding under the Credit Agreement, as well as approximately $14 million in

letter of credit commitments (the "Prepetition Obligations").  For purposes of this Order, the

Prepetition Obligations shall include the principal of, and all interest, fees, expenses, and other

charges owing as of the Petition Date in accordance with the Credit Agreement Documents.

3.      Prior to the Petition Date, the Debtors and certain entities, subsidiaries and

affiliates of the Debtor, referred to as Rubie's Group, granted to the Bank Group, as lenders, and

HSBC, as agent, security interests and liens (the "Prepetition Liens") on their assets, including

certain investment accounts, identified as Collateral[2] pursuant to a Security Agreement, dated

---

[2]    Under the Security Agreement, the assets comprising the "Collateral" in which the Debtors as "Grantor" granted
a security interest includes: (a) all personal property and fixtures of every kind and nature, wherever located,
whether now owned or hereafter acquired or arising, of such Grantor and all Proceeds and products thereof,
including, without limitation, all (i) Accounts, (ii) Receivable Records, (iii) Equipment, (iv) General
Intangibles, (v) Inventory, (vi) Instruments, (vii) Pledged Debt, (viii) Pledged Equity, (ix) Documents, (x)
Collateral Records, (xi) Chattel Paper (whether tangible or electronic), (xii) money, (xiii) Deposit Accounts,
(xiv) Payment Intangibles, (xv) Letter-of-Credit Rights (whether or not the letter of credit is evidenced in
writing),(xvi) Commercial Tort Claims, (xvii) Supporting Obligations, (xviii) any other contract rights or rights
to the payment of Money, (xix) tort claims, (xx) all insurance policies, (xxi) insurance claims and
proceeds,(xxii) Investment Property, including, without limitation, Securities (whether certificated or
uncertificated), Security Entitlements and Securities Accounts, and (xxiii) unless otherwise agreed upon in
writing by such Grantor and the Agent acting at the direction of the Lenders in accordance with the Credit
Agreement all other tangible and intangible property owned or held by or on behalf of such Grantor that may be
delivered to and held by the Agent pursuant to the terms hereof and (b) all cash or non-cash Proceeds of any of

June 27, 2019 (the "Prepetition Collateral"). In connection therewith, the Debtors pledged approximately $17.14 million as cash collateral, maintained in the following investment accounts of the Debtor (the "Pledged Cash Accounts"), which are subject to deposit account control agreement or a security account control agreement (each a "DACA" or "SACA" as applicable) with the Bank Group as follows:  (i) JPM account xxxx1002, currently with a balance of $4,472,878.72; (ii) Merrill Lynch accounts WCMA xxx-02659 and xxx-02652, currently with a combined balance of $4,599,440.73;  (iii) Citi account xxxx5138 with a current balance of $5,713,459.84 (iv) an HSBC certificate of deposit in the amount of $2,023,049.91; and a (v) Charles Schwab account xxxx4646 with a current balance of amount $334,556.61

       4.    Validity Prepetition Obligations.  (a) The Prepetition Obligations constitute legal, valid, binding, enforceable and non-avoidable obligations of the Debtors in accordance with the terms of the Credit Agreement Documents and are hereby deemed to be allowed claims against the Debtors;  and (b) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Obligations exist, and no portion of the Prepetition Obligations is subject to any challenge or defense of any kind or nature including, without limitation, avoidance, disallowance, disgorgement, recharacterization or subordination (whether equitable or otherwise pursuant to the Bankruptcy Code or applicable non-bankruptcy law).

       5.    Validity of Prepetition Liens.  The Prepetition Liens constitute legal, valid, binding, properly perfected and enforceable first priority liens on and security interests in the

---

the foregoing, including all Proceeds which constitute property of the types described in clause (a) above, and to the extent not otherwise included, all payments and rights under any issuance, indemnity, warranty or guaranty with respect to any of the foregoing Collateral and excluding, in all cases, any Excluded Assets;  provided that, Collateral shall not include Intellectual Property.

Prepetition Collateral (including in the Cash Collateral) that are not subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

      6.    <u>Cash Collateral</u>.   All of the Debtors' cash, which shall include, but not be limited to, any and all cash of any kind, whether in reserved accounts, blocked accounts or otherwise, including the Pledged Cash Accounts, in the accounts of the Debtors constitute cash collateral within the meaning of Section 363(a) of the Bankruptcy Code. (the "<u>Cash Collateral</u>").

    D.    <u>Cause Shown</u>.

      1.    Good cause has been shown for the entry of this Order.  The Debtors have a need to use Cash Collateral to pay ongoing operating expenses, and to allow the Debtors to continue to operate and thereby preserve the value for the Bank Group and HSBC and the estates.  Without payment of their costs and expenses, the estates will suffer immediate and irreparable loss of value.

      2.    These expenditures are necessary and appropriate to avoid irreparable harm to the Debtors' estates because the only means of revenue generation is through the continued operation of the company, which also will result in the continued generation of new Cash Collateral.  Permitting the Debtors to pay operating expenses, including inventory, will minimize disruption to the Debtors' business and operations, allow the Debtors to honor their obligations to vendors, employees and customers, and will preserve the value of Prepetition Collateral.  The use of Cash Collateral will, therefore, help preserve and maintain the going concern value of the Debtors and their estates, and will enhance the prospects for a successful reorganization of the Debtors under chapter 11 of the Bankruptcy Code.

    E.    <u>Adequate Protection</u>.  Solely to the extent of the Prepetition Obligations, the Bank Group as lender and HSBC as agent is entitled, pursuant to Sections 361, 362(d) and 363 of the

Bankruptcy Code, to adequate protection for (i) use of the Cash Collateral, (ii) the imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code (the "Automatic Stay"), and (iii) the use, sale, or lease of the Prepetition Collateral under Section 363 of the Bankruptcy Code (collectively, the "Adequate Protection Obligations").  The imposition of the automatic stay and the use, sale or lease of the Prepetition Collateral during the term of this Order is to be used exclusively in accordance with the terms, conditions and limitations set forth in this Order, including, without limitation, the adequate protection described herein.

F.      Good Faith.  Pursuant to Bankruptcy Code Sections 105, 361 and 363, the Debtors are hereby found to have acted in "good faith" in connection with the request for entry of this Order.

G.      Notice.  Notice of the hearing and the relief requested in the Motion has been provided by the Debtors to certain parties in interest, including:   (a) the U.S. Trustee;  (b) the Internal Revenue Service;  (c) the parties included on the Debtors' list of the 30 largest unsecured creditors;  (d) the U.S. Attorney for the Eastern District of New York;  (e) the Bank Group and HSBC as its administrative agent;  and (f) any such other party entitled to notice pursuant to Rule 9013-1(d) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of New York.

H.      Fair and Reasonable.  Based on the Motion, the materials submitted in support of the Motion, including without limitation the First Day Declaration, Declaration of Baker Smith in support of the Motion, and the record presented at the hearing held on May [__], 2020 (the "Interim Hearing"), the terms of the use of the Cash Collateral by the Debtors, including the adequate protection granted herein in respect of the Adequate Protection Obligations, are fair and

reasonable, and reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties.

I.      <u>Immediate Entry of Final Order</u>.  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2).  The Court concludes that entry of this Order is in the best interest of the Debtors' estates and all creditors and is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED** that:

1.      <u>Disposition</u>.  The Motion is granted on an interim basis to the extent set forth herein.  Any objections to the Motion to the extent not withdrawn are hereby denied and overruled.

2.      <u>Effect</u>.  The Debtors' interim authorization to use Cash Collateral, including the Pledge Accounts Cash, and provide adequate protection pursuant to the terms of this Order shall commence as of entry of this Order by the Court.

3.      <u>Use of Cash Collateral.</u>

a.      The Debtors shall not use any Cash Collateral except (i) upon the terms and conditions set forth in this Order and Budget, (ii) upon prior written consent the Bank Group or HSBC, or (iii) as otherwise approved by this Court.

b.      The Debtors are hereby authorized, subject to the terms and conditions of this Order, to use Cash Collateral during the period from the entry of this Order through the Termination Date (as defined below) to fund Debtors' business consistent with the four week period provided for under the Budget, and make the Adequate Protection Payments as set forth in

the rolling 4-week cash flow forecast of the Debtors' cash receipts and expenditures, attached hereto as Exhibit 1 (as updated monthly pursuant to paragraph 4 below and as otherwise amended, extended, supplemented or otherwise modified in accordance herewith, the "Budget")[3].   On or before the Final Hearing on the Motion, the Debtors shall commence utilizing a 13-week Budget in place of a 4-week Budget.

   4. <u>Reporting</u>.   The Debtors shall deliver to the Bank Group and HSBC:

    a. On or before the fifteenth day after the end of each month (unless such day is not a business day, in which case the required delivery date shall be the next succeeding business day), an updated Budget for the next cash flow projection period

    b. The Debtors will also continue to provide (i) a rolling 13-week cash flow update, with a budget vs. actual report for the prior week and on a cumulative basis up to four weeks and (ii) a weekly flash report outlining the borrowing base availability under the Credit Agreement as well as current account receivables, inventory and cash collateral balances.

    c. The Debtors will work in good faith cooperatively with the Bank Group and HSBC to resolve any questions or disputes regarding any updated Budget, or the reports described herein.

---

[3] The Debtors shall be permitted during each weekly period covered by the Budget (i) to exceed any category in the Budget by up to ten percent (10%) and (ii) to exceed total outstanding disbursements as set forth in the Budget by up to ten percent (10%), which variance may be rolled forward.

5.    <u>Access.</u>  The Debtors shall make themselves available during normal business hours and with reasonable advance notice to discuss the details of the reports provided in accordance with Paragraph 4 herein with

6.    <u>Adequate Protection</u>.  As adequate protection for the Adequate Protection Obligations, solely to the extent of any diminution in value of the Prepetition Collateral, the Bank Group as lender, and HSBC as agent, is hereby granted the following:

a.    <u>Adequate Protection Liens</u>.  Pursuant to Sections 361(2), 363(c)(2) and 363(e) of the Bankruptcy Code, solely on account of diminution in value of the Prepetition Collateral arising from the use of Cash Collateral, the imposition of the Automatic Stay, or the use, sale, or lease of the Prepetition Collateral, valid, binding, continuing, enforceable and perfected non-avoidable first priority security interests in, and liens on (the "<u>Postpetition Liens</u>"), all of the Debtors' now owned or hereafter acquired property and assets, real or personal, tangible or intangible, including all of the Prepetition Collateral, and all proceeds, products, rents, and revenues of any and all of the foregoing, along with any property acquired postpetition that forms part of, or is an appurtenance to, the  Prepetition Collateral (collectively, the "<u>Postpetition Collateral</u>"), (i) subject to the Carve-Out (as defined below) and (ii) excluding avoidance causes of action (and proceeds thereof) arising under Bankruptcy Code Sections 544, 545, 546, 547, 548, 549, 550, and 553 (collectively, the "<u>Avoidance Actions</u>").   Each such Postpetition Lien shall be, subject to the Carve-Out, (i) a first priority, perfected lien upon all of the Postpetition Collateral that is not otherwise encumbered by a validly perfected, enforceable, non-avoidable security interest or lien, and (ii) a second priority perfected lien upon all Postpetition Collateral, which is subject to a validly perfected lien as of the Petition Date, to the Restricted Permitted Liens (as defined below), or to a valid and unavoidable lien in existence

immediately prior to the Petition Date that is perfected after the Petition Date as permitted by Bankruptcy Code Section 546(b).  The Postpetition Liens shall in all cases be prior and senior to all liens, encumbrances and security interests in and to such Postpetition Collateral granted by operation of law or consensually by the Debtors after the Petition Date except for liens, encumbrances and security interests that meet the following three conditions:  (x) the lien, encumbrance or security interest is incidental to the conduct of the business of the Debtors;  (y) the lien, encumbrance or security interest arises by operation of any applicable law;  and (z) pursuant to applicable law, the lien, encumbrance or security interest ranks prior and senior to, or *pari passu* with, the Postpetition Liens (the "Restricted Permitted Liens").

        b.    Adequate Protection Payments.  The Debtors shall each month (i) pay to the Bank Group and HSBC the current interest payments due on the Prepetition Obligations at the non-default contract rate of interest set forth in (and at the times provided in) the Credit Agreement Documents (the "Adequate Protection Interest Payments") and (ii) pay the reasonable and documented unpaid post-petition fees and expenses of legal, financial, and other professionals of the Bank Group and HSBC in connection with the Credit Agreement Documents and/or the Debtors' Chapter 11 Cases (the "Expense Reimbursement," and together with the Adequate Protection Interest Payments, the "Adequate Protection Payments").  The parties reserve all of their respective rights, claims and defenses with respect to the payment of prepetition fees, costs and expenses in respect of the Credit Agreement Documents.  To the extent that the Debtor has not paid any postpetition amount of interest or expense reimbursement due and owing prior to the entry of this Order, the Debtor is authorized to make such payments upon entry of this Order and subject to the terms hereof and thereof.  None of the fees, costs and expenses payable pursuant to this Paragraph 6 shall be subject to separate approval by this Court,

and no recipient of any such payment shall be required to file or serve upon any party an interim

or final fee application with respect thereto. The U.S. Trustee and the Committee, if one is

appointed by the U.S. Trustee, shall have seven (7) days from the date of delivery of such

invoices to review and, if appropriate, dispute any of such fees and expenses by filing with the

Court and serving upon the Bank Group and HSBC a written objection to the reasonableness of

such fees, costs and expenses. The Debtors shall not be authorized to make any of the payments

that have been objected to. Upon entry of an order by the Court resolving such objection (or if

such objection is otherwise withdrawn or resolved), the Debtors are authorized by pay such

amounts no longer in dispute.

7.     507(b) Claims. Solely on account of diminution in value of the Prepetition

Collateral arising from the use of Cash Collateral, the imposition of the Automatic Stay, or the

use, sale, or lease of the Prepetition Collateral, the Adequate Protection Payments and the

Adequate Protection Obligations, to the extent not satisfied by the Adequate Protection Payments

and the Postpetition Liens, shall constitute expenses of administration under Bankruptcy Code

Sections 503(b), 507(a) and 507(b) (the "507(b) Claims"), and solely of the Debtors with priority

in payment over any and all administrative expenses of the kinds specified or ordered pursuant to

any provision of the Bankruptcy Code, including without limitation, Bankruptcy Code Sections

105, 326, 328, 330, 331 and 726, and shall at all times be senior to the rights of the Debtors, and

any successor trustee or any creditor in the Chapter 11 Cases or, to the extent permitted by

applicable law, any subsequent proceedings under the Bankruptcy Code; provided, however,

that the 507(b) Claims (i) shall be subject to the Carve-Out (as defined below) and (ii) exclude

any Avoidance Actions. Except for the Carve-Out, no cost or expense of administration under

Bankruptcy Code Sections 105 or 503(b) or otherwise, including those resulting from the

conversion of the Chapter 11 Cases pursuant to Bankruptcy Code Section 1112, shall be senior to the 507(b) Claims of the Bank Group and HSBC arising out of the Adequate Protection Payments.  For purposes of this Order, the term "Carve-Out" shall mean (a) in connection with the Debtors' Chapter 11 Cases prior to a Termination Event (as defined below) (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code for the Chapter 11 Cases, whether paid directly by the Debtors or on their behalf, and (ii) professional fees and expenses of the Debtors that are incurred and that actually and directly relate to the Debtors' Chapter 11 Cases, and invoiced and payable under sections 330 and 331 of the Bankruptcy Code or otherwise, whether prior to or after a Termination Event, whether paid directly by the Debtors or on their behalf in an amount not to exceed the amount set forth in the Budget and (b) in connection with the Debtors' Chapter 11 Cases after a Termination Event and without duplication of the amounts described in clause (a) above, an aggregate amount not to exceed $500,000 comprised of professional fees and expenses of the Debtors that are incurred and that actually and directly relate to, the Debtors' Chapter 11 Cases; all of the foregoing whether paid directly by the Debtors or on their behalf; provided, however, that the Debtors shall be permitted to pay the professional fees and expenses described in clause (b) and the amount of such fees and expenses (to the extent allowed by the Bankruptcy Court) paid under clause (b) shall not be reduced by the amount of any compensation and reimbursement of expenses incurred prior to the occurrence of a Termination Event whether paid prior to or after a Termination Event. In the event that the U.S. Trustee appoints a Committee in the Chapter 11 Cases, the Court will consider an appropriate carve-out for Committee expenses and professional fees.

8.      <u>Limitations on Cash Collateral</u>.  No proceeds of the Prepetition Collateral or Cash Collateral shall be used, without the prior written consent of the Bank Group or HSBC for the purpose of objecting to, challenging or contesting in any manner, or in raising any defenses to, the amount, validity, extent, perfection, priority or enforceability of the Prepetition Obligations, or any liens or security interests with respect thereto, including, without limitation, for lender liability or pursuant to Sections 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; <u>provided</u> that, for the avoidance of doubt, advisors to the Committee (if one is appointed by the U.S. Trustee) and the Debtors, subject to the provisions of paragraph 9, may investigate the Prepetition Obligations and liens and security interests with respect thereto, and commence any related proceedings and <u>provided</u>, further, that any fees and expenses incurred in connection therewith shall be paid by the Debtors from assets that are not Prepetition Collateral, Cash Collateral or Postpetition Collateral, but under no circumstances shall any fees and expenses incurred in connection with objecting to, challenging or contesting the Prepetition Obligations and liens and security interests related thereto be allocated and included in the Carve-Out unless (i) the Debtors or Committee successfully avoids the Bank Group and or HSBC liens in the Prepetition Collateral or Cash Collateral.

9.      <u>Debtor Challenge Period and Committee Investigation Period</u>.  The Stipulations in Paragraph C hereof shall be binding upon the Debtors immediately on the entry of this Order, except as set forth in the immediately following sentence.   Notwithstanding the foregoing, nothing in this Interim Order shall prejudice any rights of the Debtors to object to or challenge the Stipulations set forth in paragraph C of this Order or to bring suit against the Bank Group or HSBC in connection with or related to the matters covered by paragraph C of this Order, <u>provided</u>, that unless the Debtors commence an adversary proceeding or contested matter (as

applicable) raising such objection or challenge, or filing suit with respect to the claims or causes

of action by the date that is sixty (60) days following the entry of this Order, as such date may be

extended by written agreement among the Debtors and Bank Group or HSBC without further

order of the Court (the "Debtor Challenge Period," and the date that is the next business day after

termination of the Debtor Challenge Period shall be referred to as the ("Debtor Challenge Period

Termination Date")), upon the Debtor Challenge Period Termination Date, any and all such

challenges and objections by the Debtors shall be deemed forever and irrevocably waived,

relinquished and barred and the Stipulations set forth in paragraph C shall be binding on the

Debtors.  The Stipulations shall be binding on all other parties in interest, including a Committee

(if one is appointed by the U.S. Trustee), unless (a) a party in interest (including the Committee)

files an adversary proceeding or contested matter challenging or otherwise objecting to the

Stipulations, including the amount, validity, enforceability, perfection or priority of the

Prepetition Obligations, the Credit Agreement Documents or the Prepetition Liens in respect

thereof, on or before seventy-five (75) days after the entry of this Order (the "Committee

Investigation Period") or such later date as has been (i) agreed to, in writing, by the Bank Group

or HSBC or (ii) ordered by the Court for cause shown, and (b) the Court rules in favor of a

plaintiff or movant in any such timely filed adversary proceeding or contested matter and such

ruling becomes a final order.

      10.    Modification of Automatic Stay.  The Automatic Stay shall be modified to the

extent necessary, if at all, to take all actions necessary to implement and effectuate the terms and

conditions of this Order, including, without limitation, (a) to allow the Adequate Protection

Payments to be made, and (b) to allow the Bank Group or HSBC, upon the occurrence of a

Termination Event (as defined below), to terminate the use of Cash Collateral in accordance with

this Order.  For the avoidance of doubt, the Automatic Stay shall not be modified and be in full

force and effect with respect to the approximately $8.65 million in cash surrender value under

the Rubie's Life Insurance Policies otherwise pledged to the Bank Group and HSBC unless as

set forth in section (b) hereunder.

11.     <u>Perfection of Liens</u>. The Postpetition Liens granted pursuant to this Order shall

constitute valid, enforceable and duly perfected security interests and liens, and the Bank Group

or HSBC shall not be required to file or serve financing statements, notices of lien or similar

instruments which otherwise may be required under federal or state law in any jurisdiction, or

take any action, including taking possession, to validate and perfect such security interests and

liens; and the failure by the Debtors to execute any documentation relating to the Postpetition

Liens shall in no way affect the validity, perfection, enforceability or priority of such Postpetition

Liens.  If, however, the Bank Group or HSBC shall determine to file any such financing

statements, notices of lien or similar instruments, or to otherwise confirm perfection of such

Postpetition Liens, the Debtors shall cooperate with and assist in such process, the Automatic

Stay is hereby lifted to allow the filing and recording of a certified copy of this Order or any such

financing statements, notices of lien or similar instruments, and all such documents shall be

deemed to have been filed or recorded on the date of this Order.

12.     <u>Insurance</u>. The Debtors shall provide continued maintenance of and appropriate

insurance amounts consistent with the Debtors' prepetition practices.

13.     <u>Termination</u>. Only after the expiration of a Remedies Notice Period, the Debtors'

authorization to use Cash Collateral hereunder shall terminate on the date of the occurrence of a

Termination Event (as defined below).  Each of the following events shall constitute a

termination event ("<u>Termination Event</u>"), upon the occurrence of which the use of Cash

Collateral pursuant to this Order shall terminate (except as the Bank Group or HSBC may otherwise agree in writing) upon the earliest to occur of:

       a.      The reversal, vacatur or, modification or stay of this Order in any manner materially adverse to the Bank Group or HSBC, without the prior written consent of the Bank Group or HSBC, or any of the Debtors shall file any pleading seeking the foregoing relief;

       b.      The entry by the Court of an order (i) dismissing the Chapter 11 Cases, (ii) converting the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or (iii) appointing a Chapter 11 trustee or an examiner where such Chapter 11 trustee or examiner is given the power to operate the Debtors' business, or the Debtors shall file any pleading seeking the foregoing relief;

       c.      The failure of the Debtors to make any payments as set forth in Paragraph 6 herein when due, in the event that such failure is not cured on or within (10) business days after the delivery of written notice of such failure by the Bank Group or HSBC to the Notice Parties (as defined below);

       d.      The failure of the Debtors to comply with the reporting requirements as set forth in Paragraph 4 herein, in the event that such failure is not cured on or within fifteen (15) calendar days after the delivery of written notice of such failure by Bank Group or HSBC to the Notice Parties (as defined below);

       e.      Commencement of any action, including the filing of any pleading, by the Debtors, or direct or indirect non-debtor affiliate or subsidiary of the Debtors, after the Debtor Challenge Period Termination Date against the Bank Group or HSBC challenging the matters stipulated to in paragraph C above;

   f. The Postpetition Liens and the 507(b) Claims granted to the Bank Group or HSBC shall cease to be valid, perfected and enforceable in all respects;

   g. The Debtors shall fail to comply with any other provision of this Order and such failure shall continue unremedied for ten (10) business days following written notice thereof from the Bank Group or HSBC.

  To the extent the Debtors becomes aware of a Termination Event, the Debtors shall promptly provide notice to the Bank Group or HSBC, the Committee (if one is appointed by the U.S. Trustee) and the U.S. Trustee of the occurrence of such Termination Event (collectively, "Notice Parties").  For the period that is ten (10) business days after the notice of a Termination Event (the "Remedies Notice Period"), the Debtors and the Committee, (if one is appointed by the U.S. Trustee) shall be entitled to seek an emergency hearing with the Court in connection with any alleged Termination Event (at which hearing the sole issue for determination by the Court will be whether a Termination Event occurred), and the Debtors will continue to be authorized to use Cash Collateral pending such judicial determination.

  14. Binding Effect of Order.  To the extent permitted under applicable law, the terms and provisions of this Order shall be binding upon and inure to the benefit of the Debtors, the Bank Group or HSBC and each of their successors and assigns, including, but not limited to, any Chapter 11 or Chapter 7 trustee hereinafter appointed or elected for the estate of any of the Debtors.  To the extent there is any inconsistency between this Order and any order concerning the Debtors' cash management and/or bank accounts, this Order shall control.

  15. Survival.  The provisions of this Order and any actions taken pursuant thereby shall survive the entry of any order which may be entered:  (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting the Chapter 11 Cases to a case

under Chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Case or any successor cases; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases.

16.     If an order dismissing the Chapter 11 Cases under Bankruptcy Code Section 1112 or otherwise is at any time entered this Court shall retain jurisdiction for purposes of enforcing this Order.

17.     <u>Final Hearing</u>.  The Final Hearing shall be held on May [__], 2020 at [___} (EST) before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, to any Committee appointed in the Chapter 11 Cases after the same has been appointed, or counsel to such Committee, if the same shall have been appointed, and to any other party that has filed a request for notices with this Court. Any objections to the granting of the relief requested in the Motion on a permanent basis must be filed no later than [_____], 2020 at [____] (EST) (the "<u>Objection Deadline</u>").

18.     <u>Immediate Effect</u>.  This Order shall constitute findings of fact and conclusions of law and shall be fully enforceable immediately upon entry notwithstanding the applicability of Bankruptcy Rule 6004(h) or otherwise, provided, however, that nothing contained in this Interim Order shall prejudice in any way the rights or abilities of any party to assert any objections to the use of Cash Collateral or to the relief requested at the Final Hearing, and all such objections are specifically preserved.

19.     <u>Jurisdiction</u>.  This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Order

Dated: _____, 2020
                    , New York

_____
UNITED STATES BANKRUPTCY JUDGE